***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence and, having reviewed the competent evidence of record, the Full Commission modifies the Opinion and Award of the deputy commissioner as stated below.
The Full Commission accepts as fact the following matters which were admitted by the parties at the deputy commissioner hearing as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. Defendant-employer was insured by Alexis, now RSKCo, at all relevant times herein.
4. Plaintiff's average weekly wage is $340.00 and her corresponding compensation rate is $226.67.
5. The issues before the Deputy Commissioner were:
a. Whether Defendant's Form 24 Application should be granted?
 b. Whether Plaintiff's current disability is proximately caused by her June 24, 1996 compensable injury by accident?
 c. If so, what, if any, additional benefits is plaintiff entitled to receive under the North Carolina Workers' Compensation Act?
 ***********
The Pre-Trial Agreement along with its attachments, the stipulated Medical Records and the Supplemental Stipulated Medical Records, and all other stipulations submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon the competent evidence adduced at the deputy commissioner hearing, depositions, and admitted evidentiary exhibits, the Full Commission makes the following additional
 FINDINGS OF FACT
Plaintiff is a 55 year old woman with a date of birth of April 16, 1947. On June 24, 1996, plaintiff was employed with defendant-employer as a machine operator. On June 24, 1996, at age 49, plaintiff sustained an admittedly compensable injury to her lower back. Defendants began paying disability benefits on May 12, 1997, and plaintiff has received total disability benefits from May 12, 1997 to present, except for a period of time when defendants paid partial disability benefits.
The current litigation was initiated by defendants' Form 24 Application to Terminate or Suspend Compensation Benefits filed April 21, 1999. That Application was later withdrawn, another Application was filed September 9, 1999, and was amended October 4, 1999, to alleged that plaintiff's continuing disability resulted solely from a seizure condition unrelated to the work injury. The Special Deputy Commissioner was unable to reach a decision on the Application in the informal "Form 24 hearing," pursuant to G.S. § 97-18.1(d), and defendants appealed to the Deputy Commissioner. The hearing before the Deputy Commissioner was de novo. Once the issues were appealed and thus were before the Commission pursuant to G.S. § 97-83, the Form 24 process was moot. Thus, the issue before the Full Commission is not whether the Form 24 Application should have been approved, but whether plaintiff is entitled to continuing disability benefits, and whether her seizure condition is related to the back injury that defendants accepted on a Form 21 agreement.
Plaintiff's husband, Lloyd Vess, testified at the deputy commissioner hearing. He explained that plaintiff has had seizures since 1977 and that the seizures were generally under control with medication. Before the June 1996 injury, plaintiff saw her neurologist every six months for her seizure condition. After the June 1996 injury, plaintiff had difficulty sleeping and approximately eight months after the injury started to experience more frequent seizures. Mr. Vess explained that Dr. Ellis referred plaintiff to Dr. Menard for her seizures and that Dr. Menard kept upping the medication and plaintiff became "zombie-like."
The medical records confirm that plaintiff has an extended history of seizures. From the mid-1970's until the time of her June 1996 injury, plaintiff was under active treatment for seizures which included the administration of anti-seizure medications, including Dilantin and Tegretol. Before the June 1996 injury, plaintiff was under the care of John Ledbetter, M.D., a neurologist, for her seizure condition, and George Ellis, M.D., a family practitioner, for her general care.
As a result of her compensable June 1996 injury, plaintiff sustained an injury to her back which has been treated with pain medications, including Talwin.
Mark L. Moody, M.D., an orthopaedic surgeon, initially treated plaintiff for her back injury from December 1996 until February 20, 1997. Dr. Moody at first believed that plaintiff had right sacroiliac joint syndrome. Plaintiff had several SI joint injections without improvement. A bone scan was negative for abnormalities in the SI joint, lumbar spine, or pelvic region. Dr. Moody ultimately diagnosed plaintiff with nonradiating right sided lumbosacral junction pain. Apparently after a period of a few months, Dr. Moody again saw plaintiff, on August 25, 1997, and again Dr. Moody released her to return to work, 4 hours per day, with follow-up by Dr. Rudins.
On November 19, 1996, a functional capacity examination showed that plaintiff could work at medium to medium-heavy duty levels. Even as late as September 1997, this FCE was considered valid and reflective of plaintiff's physical abilities. Dr. Rudins, on September 4, 1997, noted as follows: "I had a long discussion with Ms. Vess regarding the fact that from a purely medical standpoint, she has minimal restrictions, I would base these restrictions on the last FCE, where she actually tested at a fairly reasonable level. To maximize her chance for success, I would tend to place her restrictions at slightly below that level, but in any case they would still be well within her current job, which she states she is unable to do."
8. Plaintiff was treated by Andrew Rudins, M.D., a board certified physician of physical medicine and rehabilitation. Dr. Rudins testified that plaintiff sustained a lumbosacral sprain with resulting back pain as a result of her injury at work. Dr. Rudins testified that plaintiff was not totally disabled as a result of her injury, but, based on her complaints of pain and because of her depression, she would not be able to return to her job as a timesaver machine operator. Dr. Rudins found plaintiff at MMI and assigned an impairment rating of 2.5% for her lower back on September 18, 1997. On December 8, 2000, he increased the restrictions to 10 pounds because of her "functional decline." He found that her deconditioning and pain syndrome and depression had worsened even though the low back condition itself had not changed. Plaintiff's stress could just as likely have resulted from the unresolved workers' compensation claim (litigation related stress) as from the back injury.
9. On the issue of causation of plaintiff's increase in seizure activity, Dr. Rudins stated that stress could trigger a seizure reoccurrence but that he would defer to a neurologist on that issue. He testified that the relationship between her stress and her seizures was "a possibility."
10. Dr. Rudins explained that there was evidence of secondary gain in plaintiff's presentation of her symptoms. In particular, Dr. Rudins stated that plaintiff was persuaded by her husband to be disabled and that this was the most probable explanation for her continued work disability. Dr. Rudins gave examples of plaintiff's husband attending medical examinations and requesting the doctor to state that her condition was worse so that the Industrial Commission could rule in "his" (referring to plaintiff's husband's) favor. Dr. Rudins acknowledged that plaintiff was sent to a rehabilitation program operated by Dr. Stutesman and was noncompliant, which was consistent. He agreed with the following statement in the report of clinical psychologist, Dr. Fitzgerald: "Absent of any other data, my impression is that Ms. Vess is feeling a strong pull from her husband to essentially retire and that she has made a decision, at least at this point, not to return to work at that job in any capacity. Chronic familial disability with attendant secondary gain mechanisms seem to be most parsimonious explanation for her current prolonged work disability."
11. On September 23, 1997, Dr. Ellis noted that plaintiff reported that she was "having problems with more seizures than usual, has had 3-4 in the last month, getting worse. She has incontinence of urine when she does have a seizure now and hasn't had before." At that time, Dr. Ellis also reported that plaintiff was still taking Talwin, suffering from low back pain and taking four 200 mg. tablets of Tegretol per day. Dr. Ellis referred plaintiff to Dale A. Menard, M.D., a neurologist.
12. Dr. Ellis, a board certified family practitioner, testified that plaintiff had been a patient at his clinic for approximately thirty years. Dr. Ellis confirmed that plaintiff had been diagnosed and treated for seizures prior to her 1996 back injury and was on Tegretol and Dilantin prior to her injury. Dr. Ellis first saw plaintiff for her 1996 injury in February 1997, after she had been under the care of Dr. Moody, an orthopedic surgeon. Dr. Ellis referred plaintiff to Dr. Roten, a neurosurgeon, for care, and Dr. Roten prescribed Talwin for her back injury. Dr. Ellis opined that pain, pain medication, stress, depression, and sleep deprivation could reduce a person's threshold to resist a seizure and thereby produce greater seizure activity. Dr. Ellis, however, explained that he does not diagnose seizure activity and that he refers patients with epileptic conditions to neurologists. Dr. Ellis believed that plaintiff had a bulging disc at L4-5 that could be causing her pain, but he did not know whether this condition was caused by her June 1996 injury. Dr. Ellis believed that plaintiff should not be working around machinery if she was experiencing seizures. And, at the time of his deposition in August 2001, Dr. Ellis did not believe that plaintiff should return to work, because of her seizures.
13. Dale A. Menard, M.D., is a physician board certified in the field of neurology. Dr. Menard starting treating plaintiff in January 1998. Initially Dr. Menard noted non-radicular pain which extended from the low back to the buttock region; however, by July 1998, the pain extended into plaintiff's leg. Plaintiff also complained that she was experiencing an increase in her baseline seizure frequency. By 2000, Dr. Menard was no longer treating her back and leg pain, but was primarily trying to work on her seizure disorder. Dr. Menard was not convinced that plaintiff was having epileptic seizures. Her episodes appeared more consistent with panic attacks and a panic disorder than true seizures. Plaintiff, however, had an abnormal EEG which was consistent with right temporal rhythmic discharge, an epileptic event. By August 2000, with medication, plaintiff was seizure free but was significantly sedated and unsteady. Dr. Menard could not determine whether plaintiff's sleepiness and difficulty with motor function was due to the effect of the medications, or whether plaintiff was developing significant depressive symptoms. By December 2000, Dr. Menard did not know if plaintiff was experiencing epileptic seizures, non-epileptic events or panic attacks, and could not determine whether plaintiff's behavior and sedation was related to medication or depression. Baffled about the nature of and the cause for plaintiff's condition, Dr. Menard transferred plaintiff's care to Dr. Richard Marcus, one of his associates who concentrated in epilepsy.
14. Dr. Menard explained that plaintiff was suffering from chronic low back pain and explained that plaintiff's medication, stress, and lack of sleep from her low back condition could have lowered plaintiff's threshold to resist seizures and thereby result in more frequent seizure attacks. Dr. Menard stated that the low back injury itself did not cause plaintiff to have seizure activity and that he could not give the likely cause of her condition because there were so many potential issues. Dr. Menard did not believe that plaintiff could work and doubted that she would return to work, particularly because of plaintiff's and her husband's antagonistic attitude toward the Industrial Commission and her employer, which aggravated underlying psychiatric issues and could cause plaintiff's pseudoseizures, depression, and pain to be worse. Although Dr. Menard expressed numerous opinions concerning the nature and cause of plaintiff's condition, he ultimately concluded that he was not able to determine whether plaintiff was experiencing real epileptic seizures, pseudoseizures, panic attacks, and/or depression and did not know the cause for these potential conditions. Because Dr. Menard was baffled as to the nature and etiology of plaintiff's reported symptoms and his treatment was not beneficial, he referred plaintiff to another physician. Despite his best efforts, Dr. Menard's opinions fall into the category of possibility and speculation rather than a reasonably conclusive medical opinion. Dr. Menard identified many possibilities, but he was unable to identify the answers concerning the nature of plaintiff's condition and the appropriate treatment.
15. Plaintiff attended a work hardening program with Andrea A. Stutesman, M.D., a physician board certified in the field of physical medicine and rehabilitation. Dr. Stutesman explained that plaintiff demonstrated many positive Waddell signs which indicated symptom exaggeration and symptom magnification. Dr. Stutesman's diagnosis of plaintiff's work-related condition was "mild lumbar strain and symptom exaggeration." Dr. Stutesman also reported that plaintiff was diagnosed with left leg discrepancy with mild compensatory scoliosis and a history of a seizure disorder versus pseudo seizures and anxiety disorder, which were not related to her work injury.
16. Dr. Stutesman testified that plaintiff was deconditioned and that she placed plaintiff in a work hardening program intended to increase her hours of activity gradually for a successful return to work. Plaintiff initially started the rehabilitation program by attending 2 hours a day, and based on her good progress her program was increased to 4 hours per day. Plaintiff was exhibiting fluid motion and was not reporting significant pain or difficulty with the program, but she developed a habit of leaving the program at 10:30 each morning for no apparent reason. Plaintiff expressed anger with her former employer, and frustration and resistance with attempts to place her in employment.
17. Dr. Stutesman explained that there was no complaint of and no signs of seizure activity while plaintiff was at the rehabilitation center. During the program, Dr. White admitted plaintiff to Baptist Hospital for further study of her seizure disorder. According to Dr. Stutesman, during this admission plaintiff had one right temporal lobe seizure which consisted of a sense of fear following palpitation, staring, confusion, and unresponsiveness for a brief period of time. Dr. Stutesman spoke with Dr. White and Dr. Menard concerning plaintiff's seizure condition because Dr. Ellis took plaintiff out of the rehabilitation program until information concerning plaintiff's seizure study was reviewed by the neurologists. Dr. Stutesman indicated that Dr. Menard advised that plaintiff could continue with the rehabilitation program. Dr. Stutesman did not find the seizure activity to be disabling because, by history, the seizures tended to occur at night when plaintiff was attempting to fall asleep, were not observed at the rehabilitation center, and Dr. White and Dr. Menard believed the seizures could be controlled with medications. Further, Dr. Stutesman advised that she consulted Dr. Menard concerning plaintiff's ability to drive and that Dr. Menard did not see any reason why plaintiff could not drive. Dr. Stutesman advised plaintiff to drive short distances close to her home, in the parking lot with her husband, or other comfortable locations as a means to gradually increase her time in driving until plaintiff felt comfortable with this activity. Plaintiff did not follow Dr. Stutesman's directions.
18. In the course of the rehabilitation program, one of Dr. Stutesman's therapists visited the defendant-employer's plant and observed various jobs in an effort to locate positions that plaintiff would be able to perform. Based on the report of the therapist, Dr. Stutesman believed that the "boring machine" operator was a position that plaintiff was capable of performing because it was a self-paced position with physical requirements within plaintiff's restrictions and abilities. Dr. Stutesman also believed that plaintiff could perform the Gre Con, molder off bearer, drawer guides assembly, and dovetail off bearer positions. Dr. Stutesman explained that the boring machine operator position was sedentary work which plaintiff could perform on a full time basis. These positions were of a sedentary nature and were within the light duty restrictions provided by Dr. Rudins. Although plaintiff in her brief challenges that defendants failed to prove that these jobs were "suitable," there is no evidence to contradict the fact that the therapist visited the plant, observed the jobs, and obtained descriptions of actual positions available at the plant. The clear, reasonable inference is that these jobs were actual positions at defendant-employer's plant.
19. Dr. Stutesman explained that plaintiff was not compliant with the work conditioning program and that her non-compliance was due to secondary gain, which could result from financial interests and/or her need for attention. Consistent with the testimony of Dr. Rudins, Dr. Stutesman explained that plaintiff was experiencing a strong pull from her husband to be disabled and that plaintiff had made the decision to not return to work. There was no objective medical reason explaining plaintiff's failure to return to work.
20. Dr. Stutesman expressed that plaintiff's seizure disorder was not related to her back injury. Dr. Stutesman did indicate, however, that antidepressant medications can lower a seizure threshold. Dr. Stutesman also indicated that plaintiff could not be released to the boring machine operator or other positions with defendant-employer if her seizures were out of control. Dr. Stutesman explained that she did not treat seizures disorders and therefore consulted with Dr. White and Dr. Menard concerning the effect of this condition on her treatment plan and ability to drive and work.
21. After her release to work by Dr. Stutesman, plaintiff complained of increased seizure activity to Dr. Ellis and Dr. Menard, who concluded that plaintiff should not return to work until her seizures were under control.
22. In January 2001, plaintiff started under the care of Richard W. Marcus, M.D., a physician board certified in neurology with a fellowship in the study of epilepsy and added qualifications in neurophysiology and sleep disorder medicine. Upon first examining plaintiff, Dr. Marcus reported that she was a nonfunctional "zombie." His initial diagnosis was partial-complex seizures with apparent right temporal lobe focus. Counsel asked Dr. Marcus whether back pain, lack of sleep from pain, stress, and medications could cause seizures or lower the threshold to resist seizure activity. Dr. Marcus explained that back pain does not cause seizures. Lack of sleep, stress, and medications can increase the incidence of seizures, but that this circumstance was not likely. In response to questions concerning causation of plaintiff's condition, Dr. Marcus indicated that the attorneys' questions called for speculation and could not be answered to any degree of medical certainty. Plaintiff had presented with potential components of seizures, pseudoseizures, and depression-anxiety, and the potential that she might have a brain tumor or other pathology. With reduction in her medications, plaintiff's condition was improving. Dr. Marcus referred plaintiff to Dr. Bell, a neurosurgeon, for consideration of a vagal nerve stimulator. It appears that the reason for the referral to Dr. Bell was that Dr. Marcus wanted a scan of plaintiff's brain, he was not otherwise able to obtain the carrier's approval for the scan, and he knew that a scan would be part of the protocol for evaluating whether a vagal nerve stimulator might be appropriate treatment.
23. William O. Bell, M.D., is a board certified neurosurgeon. Dr. Bell expressed that he did not have all of the medical records that he felt were necessary to properly diagnose plaintiff's condition; however, his initial working diagnosis was right temporal lobe epilepsy. Dr. Bell requested a PET Scan which revealed decreased metabolic activity in the anterior medial right temporal lobe, which indicated that plaintiff's seizure focus was more than likely in the right temporal lobe. Plaintiff also had an EEG performed by Dr. Marcus, which was interpreted as normal, and prior EEG examinations which showed that her epilepsy was associated with the right temporal lobe. A MRI revealed scaring, or sclerosis, in plaintiff's right temporal lobe. Dr. Bell, therefore, thought that plaintiff qualified for a right temporal lobectomy as an effort to control her seizures. Dr. Bell performed the brain surgery, lobectomy, and prognosed that plaintiff had a 90 percent chance of being seizure free post recovery, most likely without the use of medications. Plaintiff had not had any seizures after the surgery and was progressing with a normal post-operative course. Dr. Bell explained that plaintiff's surgery was successful and that plaintiff would gradually be withdrawn from her seizure medication. Plaintiff's further care for her seizure condition was referred to Dr. Marcus. Dr. Bell expressed that plaintiff most likely would not be able to return to gainful employment; however, this opinion was based on his impression that plaintiff had a debilitating back injury that was not being treated and precluded her from gainful employment. Dr. Bell was not treating plaintiff's back injury; therefore, his opinion is based on conjecture. With reference to plaintiff's ability to work as a result of her seizure condition, assuming that she could work with her back condition, Dr. Bell expressed that plaintiff would be able to return to work and that no restrictions would be placed on her because of her post-operative condition.
24. Defendant sent plaintiff to William Michael Stephen Nesbit, M.D., a board certified neurologist, for an independent medical examination. Dr. Nesbit examined plaintiff on November 3, 1999. Dr. Nesbit performed a neurological examination and reported no objective abnormality in any of the tests. Dr. Nesbit, however, did note inconsistent responses in testing for muscle strength, which was indicative of symptom magnification. Dr. Nesbit agreed with the prior findings of MMI and the 2.5% impairment ratings given by Dr. Rudins and Dr. Moody, and felt that plaintiff could return to work and did not require further treatment for her back.
25. Dr. Nesbit expressed that he did not find any association between plaintiff's complaint of increased seizure activity and her back injury. He explained that the recurrence of seizures may not have any discernable cause and that trauma to the low back is not associated with the recurrence of seizures. Dr. Nesbit, however, did explain that there is a recognized association between pain and a lack of sleep and that it is medically recognized that a lack of sleep can precipitate seizures. Also, stress and chronic back pain can cause breakthrough seizures. Dr. Nesbit, however, did not find an association between plaintiff's back injury and the resulting sequella and her reported increased incidence of seizures. In particular, Dr. Nesbit explained that although pain, lack of sleep, and stress could be a potential cause for breakthrough seizures, these conditions were very unlikely to cause breakthrough seizures at the frequency that plaintiff reported.
26. Plaintiff sustained an injury to her low back which consists of a lumbosacral strain or strain to the SI joint as a result of her June 24, 1996 injury.
27. Evidence was presented to suggest that plaintiff's back injury, or the sequella from that injury, including pain, stress, sleep deprivation, or medications, caused plaintiff to sustain more frequent and severe seizure activity. The greater weight of the competent evidence, however, does not support that conclusion. Almost every medical witness acknowledged that it was possible that sleep deprivation, use of pain medications (including Talwin), and stress could cause breakthrough seizures, the greater weight of the evidence does not show that that is what occurred with plaintiff in this case. In reviewing this issue, the Full Commission gives less weight to the medical records and testimony of Dr. Ellis, a family practitioner, who testified that he does not diagnose seizures and, appropriately, relies upon neurologists for the diagnosis and treatment of seizure disorders. Further, Dr. Ellis' opinions appear to be based on Dr. Menard's records as opposed to Dr. Menard's deposition testimony. Dr. Menard's records include numerous statements indicating that plaintiff's seizure condition was exacerbated by her work injury, or the treatment for her work injury. In his deposition testimony, however, Dr. Menard explained that plaintiff's condition was very complex with numerous potential issues and that he could not give the most likely cause of her condition. The Full Commission accepts Dr. Menard's testimony that sleep deprivation, depression, pain medications, and many other factors are potential causes for plaintiff's reported increase in seizure activity. Dr. Menard's opinions concerning the cause of plaintiff's increased seizure activity, as expressed in his medical records, were a working diagnosis which even Dr. Menard refused to accept, and thus are given little weight. At his deposition, Dr. Menard refused to give an opinion as to the cause of plaintiff's seizure activity. The opinions of Dr. Rudins and Dr. Stutesman that plaintiff's seizures are not related to her compensable back injury are likewise given little weight because they are not neurologists and they would defer to a neurologist concerning the cause of seizures. The Commission, however, does find persuasive the testimony of Dr. Rudins and Dr. Stutesman concerning the issues of secondary gain and the pressure placed on plaintiff by her husband to get worse and become disabled. The Commission notes that plaintiff first reported an increase in seizure activity to Dr. Ellis in September 1997, shortly after Dr. Moody released plaintiff to return to work, and then again to Dr. Menard in the summer of 2000 after Dr. Stutesman released plaintiff to return to work. The Commission gives greater weight on the causation issue to Dr. Marcus, the board certified neurologist with the fellowship in epilepsy, who explained that counsel's questions concerning causation called for speculation and who stated that, although lack of sleep, stress, and medications are possible causes for an increase in seizure activity, there was not a "great risk" that these circumstances would cause increased seizure activity. Therefore, based on the greater weight of the competent evidence, the Full Commission finds that plaintiff has not established that she had an increase in seizure activity as a result of her June 24, 1996 back injury, and/or the sequella and treatment for this injury.
28. Based on the greater weight of the competent evidence, but for plaintiff's reports of increased incidence of seizure activity, plaintiff could have returned to work full time for defendant-employer on April 16, 1999, as a "boring machine" operator. After that date, plaintiff was not disabled from employment because of her back injury. As stated above, plaintiff's seizure condition is not part of her compensable back injury. Plaintiff does have restrictions which are based primarily deconditioning, but the greater weight of the evidence is that her complaints of back pain were subjective and exaggerated due to issues of secondary gain and/or issues involving stress, depression, and seizure medication.
29. Plaintiff reached maximum medical improvement for her compensable injury on April 16, 1999, when she was released to return to work by Dr. Stutesman and no further treatment for her back injury was anticipated. Plaintiff has a 2.5% permanent impairment rating to her back as found by Dr. Rudins.
30. Plaintiff `s ongoing disability after April 16, 1999, was related solely to her seizures and was not related to her back condition, which had resolved. But for her seizures, she would have been able to return to work even though work hardening would have been beneficial and defendants made it available to her.
31. Although Dr. Moody released plaintiff to return to work as of February 21, 1997, and gave her a 2.5% rating, plaintiff received additional medical treatment and apparently did not return to work until several months later. Defendants do not contest paying additional partial and total wage loss benefits after February 21, 1997. Defendants seek to terminate benefits as of April 16, 1999, when the evidence clearly shows that plaintiff was no longer disabled because of her back condition, and plaintiff's continuing disability resulted solely from her seizure condition.
 ***********
The foregoing Findings of Fact engender the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to her low back during the course and scope of her employment with defendant-employer on June 24, 1996. G.S. § 97-2(6).
2. The greater weight of the evidence fails to show that plaintiff's back injury aggravated, accelerated, or otherwise caused an increased occurrence of her seizures. Hale v. Novo Nordisk PharmaceuticalIndustries, Inc., ___ N.C. App. ___, 569 S.E.2d 724 (2002). In order to be sufficient to support a finding that a stated cause produced a stated result, evidence on causation "must indicate a reasonable scientific probability that the stated cause produced the stated result." Phillipsv. U.S. Air, Inc., 120 N.C. App. 538, 463 S.E.2d 259 (1995); Hinson v.National Starch Chem. Corp., 99 N.C. App. 198, 392 S.E.2d 657
(1990). Evidence is insufficient on causation if it "raises a mere conjecture, surmise, and speculation." Phillips, supra; Hinson, supra;see Swink v. Cone Mills, Inc., 65 N.C. App. 397, 309 S.E.2d 271 (1983) (mere possibility is not sufficient evidence). Further, the fact that there is some evidence that could be interpreted to support plaintiff's claim does not require the Commission to find for the plaintiff; rather, the Commission has the duty to weigh the evidence and may find that the evidence offered by plaintiff is insufficient or is outweighed by other evidence. Hale v. Novo Nordisk Pharmaceutical Industries, Inc., ___ N.C. App. ___, 569 S.E.2d 724 (2002). The greater weight of the competent evidence fails to establish that plaintiff's seizure condition is related to her compensable back injury.
3. As a result of her compensable back injury, plaintiff was disabled from work and was entitled to total disability benefits through April 16, 1999. G.S. § 97-29. Plaintiff's incapacity for work resulting from her compensable injury ended on April 16, 1999. Id.
4. Plaintiff has a 2.5 percent permanent impairment to her back for which she is entitled to 7.5 weeks of benefits; however, defendants were not responsible for indemnity benefits after April 16, 1999, and are entitled to an offset for overpayment of benefits beyond the 7.5 week period. G.S. § 97-31(23); Moretz v. Richards Associates,316 N.C. 539, 342 S.E.2d 844 (1986).
5. Plaintiff is entitled to reasonable and necessary medical care for her compensable low back injury, subject to the limitations of Section97-25.1. G.S. §§ 97-2(19), 97-25. Plaintiff's compensable injury does not include her seizure condition.
 ***********
Based on the foregoing, the Industrial Commission hereby enters the following
 AWARD
1. Plaintiff's claim for disability benefits after April 16, 1999, is denied.
2. Defendants shall pay for reasonable and necessary medical care for plaintiff's work-related back injury, which does not extend to or include her seizure disorder. G.S. §§ 97-2(19), 97-25, 97-25.1.
3. The parties shall pay their own costs.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIR
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER